JONES, et al. *versus* PITCHER & Co.

1. A sworn copy of a steam boat register,.from the records of the custom house, is not *prima facie* evidence of ownership, even against the party making it, under affidavit; without further proof of the fact.

2. Joint owners of steam boats, or other vessels, *for the time being*, may properly be regarded as partners, so far as relates to all liabilities incurred by the injury or destruction of such steam boat, or vessel.

3. At common law, an action *ex delicto*, against carriers, might be maintained against all, or any part of the joint owners of the vehicle of transportation; and a conviction and judgment had accordingly.

4. But in *assumpsit* against such carriers, the rule of law required all joint owners to be made defendants; and that all should be convicted or none: yet a non joinder, even in the latter case, was only to be taken advantage of by plea in abatement.

5. Our statute of 1818,[*] however, embraces within its provisions, the joint owners of a steam boat; and where such joint owners are sued as partners, for a liability incurred by the loss of the boat; a recovery can properly be had against a part of the owners.

6. An agreement, *bona fide*, for the sale of the interest in a steam boat, between part owners thereof, and a stranger, whereby the former were to execute title, when the purchase money should be paid; to hold the policy of insurance as collateral security; and to receive the consideration money, in freight; held not to continue the liability of the vendors, so as to render them responsible for the liabilities fixed upon the boat, after the execution of the contract; it *appearing that the interest in the boat had passed into the possession* and use of vendees.

7. A charge in a declaration against joint owners of a steam boat, 'that the defendants before and at the time of shipment, were the owners and proprietors of the boat; and co-partners in freighting: and which boat had been usually employed in conveying and transporting cotton, and other merchandize, for hire,' &c—held, a sufficient averment of the character of the joint owners, as common carriers, to authorise a recovery.

8. By the common law, a carrier of goods for hire, is responsible, at all events, for every injury to goods, not arising from the acts of God, or the public enemies.

[*] Aiken's Digest, 267

9. This rule is applicable to the liability of steam boat owners, for goods lost or destroyed, in their transportation.

10. The jurisprudence of this State contains a general adoption of the common law, in relation to the liabilities of common carriers.

11. Under this rule "acts of God," cannot embrace such occurrences as arise from the negligence of men; but such as occur from natural events, as lightning, earthquakes and tempests.

12. Causes to excuse the liability of ship owners and masters, other than those of the acts of God, or the public enemies; must be such as are expressly provided for by the contract.

13. A saving in a bill of lading, in respect to the "dangers of the river," would, it seems, be the same as an exception to the "perils of the sea."

14. The term "perils of the sea," (in which may be embraced perils of the river,) though generally referable to accidents peculiar to that element, is occasionally extended to a capture by a pirate; or to collision between two vessels, where no blame is imputable to either vessel, but more especially to the one injured.

15. Wherever an injury to, or loss of goods, is occasioned in consequence of the sinking of, or injury to, a steam boat, or vessel, and which the exercise of prudence or skill on the part of its proper officers, can prevent; the owners of such boat or vessel are liable.

16. A custom, among the navigators of steam boats, on a river, to preserve particular situations, in ascending and descending, would seem salutary and reasonable, and analagous to the rule governing ships passing each other at sea.

17. Such custom, if proved, would bind navigators of steam boats to its observance, and a failure to do so would be at the peril of the owners.

This was an action of assumpsit in Tuskaloosa Circuit court, by the defendants in error, against Jones and others, joint owners of the steam boat Warrior.

The plaintiffs declared for a breach of undertaking, by bill of lading, to convey certain cotton to the city of Mobile ; but which was lost, as was alleged, by the carelessness and negligence of the master of the said boat. The declaration charged the defendants,

as joint owners and co-partners, of the said steam boat, and as co-partners in the freight of said boat: and set out, substantially, that before the time of filing the said declaration, the said defendants undertook to convey, for certain reward and freight, to the city of Mobile, sixty-nine bales cotton, *the dangers of the river only excepted,* to the consignees of the plaintiffs; but that the same were lost by the negligence of the master and hands, on said boat.

The first count charged the defendants as *joint owners* and *co-partners* of the steam boat Warrior, and as co-partners in the freight of said boat: the second, as *owners* and *proprietors* of the said steam boat Warrior, and *co-partners* in freighting on the same: the third, as *owners* and *proprietors* of the steam boat Warrior, and *co-partners* in freighting on said boat, which last mentioned boat was usually employed by said defendants, in carrying and conveying and transporting of cotton, and other articles of merchandize, to and from the port of Tuskaloosa, to the port of Mobile, and other places in this state, for hire: the fourth charged the defendants as *owners* and *proprietors* of the steam boat Warrior, and *co-partners* in freighting on said boat, and set out the bill of lading at length: the fifth, as *owners* and *proprietors* of steam boat Warrior, and *co-partners* in freighting said boat, and further declared, upon a special statute of this State,* requiring a certificate of survey; and further declared against the defendants generally, setting out the manner of the loss; and averring negligence and carelessness on the part of the defendants in

* Aiken's Digest, page 73.

not obtaining the certificate. There seemed, however, to have been no recovery on the last count.

A demurrer having been filed to the declaration, and overruled, the general issue was plead, and issue joined; and a verdict was had against all the defendants, except Sims & Scott, in whose favor judgment was entered. A bill of exceptions was taken, which embraced all the points material in the consideration of the law of the case. It set out, that on the trial, the plaintiffs offered in evidence to the jury, a sworn copy of the registry of the steam boat Warrior, made in the custom house, at Mobile, with a view of showing that the defendants were owners of said boat—. to the reading of which the defendants, by their counsel, objected; which exception was sustained as to all the defendants except William Jones, on whose oath it appeared to have been made in the custom house; and against him. it was read to the jury.— That it was proved the steam boat Warrior was carrying freight, on the account of her owners; that there was a clerk on board, who kept the books, in which were charged accounts for freight; that there was no particular proof of a partnership, other than the reception of freight, upon the account of the owners. The court instructed the jury, that they might find against such of the defendants as were joint owners, if they were liable: and in favor of such, as were not liable. There were no instructions given, or requested to be given, to the jury, as to how many of the defendants were partners, other than what appeared in the bill of exceptions.

. The defendants, Sims & Scott, offered in evidence, and read to the jury, a contract between themselves and Hammond & Donaldson, for the sale of the in-

terest of the former in the boat; which was an agree-
ment, in the nature of a penal bond, whereby Sims
& Scott bound themselves for a sale of all their in-
terest in the said steam boat Warrior—and in con-
sideration whereof, the said Hammond & Donaldson
agreed to pay therefor, the sum of three thousand
five hundred dollars, to be discharged in freight; and
to cause insurance of the said steam boat, for the
sum of five thousand dollars; and to place the policy
in the possession of the said Sims & Scott, for fur-
ther security, &c.

The court instructed the jury that the contract be-
tween Sims & Scott and Hammond & Donaldson,
was a transfer of the right of the former in the steam
boat Warrior to the latter; and was sufficient to dis-
charge Sims & Scott, from all liability for losses sub
sequently occasioned by the boat—unless the con-
tract was fraudulent, or unless Sims & Scott had
subsequently received a portion of the earnings of
the boat, or had participated in the appointment of a
master, or had done other acts evincive of owner-
ship.

It was proved, that the plaintiffs, below, had not
shipped the cotton on the credit, and at the risk of
Sims & Scott, but on the credit, and at the risk of
the other defendants. The court directed the jury,
that a notice to the plaintiffs, or their agent, that
Sims & Scott had transferred their right to Ham-
mond & Donaldson, before the shipment of the cot-
ton, would prevent the plaintiffs from charging them
as joint owners. That for the purposes of the pre-
sent action, an actual notice of the transfer by Sims
& Scott to Hammond & Donaldson, need not have
been given to the other joint owners, in order to ex-

empt Sims & Scott from liability to the plaintiffs; and that it was competent to have disposed of their joint interest in the steam boat Warrior, without first obtaining the consent of the other joint owners.

Evidence was offered conducing to shew, that the steam boat Warrior, and the steam boat Erie, came in collision, and the Warrior was, thereby, sunk, on the eastern side of the Tombeckbee river, a short distance above a point where the river was about one hundred yards wide. It was further proved, that the Erie was ascending, and the Warrior descending the river; and, that, by the understanding of masters of boats, the descending boat should give the point, or pass on the outside of the ascending boat; but, that it was customary for either the ascending or descending boat to go on either side of river, and hug the points, if deemed advisable, and it was considered that they had a right to do so.—— When the collision took place, some of the witnesses testified, that it was so dark, that the Erie could not have been seen further than twenty-five or fifty yards: others, that, there was sufficient light to enable them to see across the river—one hundred yards or more. The defendants introduced a witness, for the purpose of disclosing a conversation between himself and the pilot of the Erie, on the occasion of the collision—who testified, that the pilot said, " that, on discovering the Warrior, he turned the Erie towards the bank, that the Warrior might pass on the outside; but on discovering that the Warrior did not bear out," and believing a collision unavoidable, he turned the Erie into the stream, that she might sustain as little injury, as possible, by the shock: the pilot further said, the Warrior was not in her proper place.

JONES et al. *vs.* PITCHER & CO.

The court instructed the jury, that, apart from contract at common law, common carriers, whether by land or water, were only excusable for losses which happen by the acts of God, or the public enemies: that the bill of lading before them, contained an exception, which limited to some extent, the common law liability: that, this exception (expressed in the bill of lading, "dangers of the river only excepted:") signified the natural accidents incident to river navigation, and not such as skill and foresight could avoid. In illustration of this general meaning, the court instructed the jury, that, where two vessels meet in such a situation that a collision cannot be avoided, by human prudence or skill; and a loss ensues, it is such a loss, as the owners could not be answerable for—because it would not come within the exception in the bill of lading: further, that where two boats meet at a point in the river, where it is so narrow that they cannot pass, and can neither recede or stop, but a collision is inevitable, and a loss happens—the loss would be attributable to the dangers of the river, if the officers on the losing boat had taken the precaution to ascertain, that the narrow was unobstructed, before it was entered. Again, that if, by an understanding among the masters of boats, it is the custom for ascending or descending boats to go on different sides; and either should deviate from her accustomed tract, and pass to the side assigned to the other; and while there, a loss occurs, by being stricken by the other boat—the exception, in the bill of lading, would not excuse her owners from accountability, for such loss. And, further, that where a boat should continue her course on a river, after it had become so dark, that an object in advance, which

might occasion a loss, could not be seen, in time to be avoided, and a loss ensues—the exception in the bill of lading would not exempt the owners from liability to the injured. The court also instructed the jury, that the question was not, whether negligence, in the common understanding of the term, was attributable to the master and other officers of the steam boat Warrior; but, whether a loss had been sustained by the plaintiffs, in consequence of the sinking of that boat, which the employment of prudence and skill, on the part of its proper officers, might have prevented.

The defendants, by their counsel, requested the court to instruct the jury, that one partner, without the consent of the others, could not introduce a third person, or partner, into the concern. Which charge the court refused, except so far as has been before referred to.

There was no proof of a sale, by Sims & Scott, to Hammond & Donaldson, of the interest of the former in the Warrior, before the date of the contract, before mentioned: nor was there any proof conducing to shew that Sims & Scott, were under contract with the other joint owners, to retain an interest in the Warrior for any definite period of time.

> *Gordon* and *Shortridge*, for plaintiffs.
> *Ellis* and *Stewart, contra.*

SAFFOLD, J.—This was an action of assumpsit, brought by the defendants in error, against the present plaintiffs, William Jones, Benjamin Horner, Edward Sims, David Scott, John Jones, Larkin Hammond and John W. Donaldson, owners and proprie-

tors of the steam boat Warrior, and co-partners in the freight of said boat, to recover damages for the loss of sixty-nine bales of cotton, shipped by said Pitcher & Co. on board said steam boat, to be transported from Tuskaloosa to the port of Mobile. The declaration contains several counts, the particular differences in which are unnecessary to be noticed. They allege, substantially, that the defendants below, at, and before the time of the shipment of this cotton, were the owners and proprietors of the boat, and co-parners in freighting on the same; and which boat was usually employed by them in carrying and transporting cotton, and other articles of merchandize, to and from the port of Tuskaloosa to the port of Mobile, and other places in this State, for hire; and that the said Larkin Hammond was, for the time, master thereof; and that the plaintiffs, in January, 1829, at the port of Tuskaloosa, at the special instance and request of the defendants, shipped on board said boat, sixty nine bales of cotton, then in good order and well conditioned, and of great value; viz: of the value of five thousand dollars, to be taken care of, and safely and securely carried and conveyed, in and on said boat, to the port of Mobile, and there to be delivered in like good order and condition, unto Samuel St. John, jr. or his assigns, the dangers of the river only excepted; and that, in consideration thereof, and of freight, at the rate of one dollar per bale for said cotton, the said defendants undertook, and fathfully promised the plaintiffs, that the cotton should be safely and securely carried and conveyed and delivered in Mobile, as aforesaid: yet that the said defendants, regardless of their duty and undertaking, as aforesaid, wholly failed and refused to comply there-

with. But on the contrary thereof, through the mere carelessness, negligence, improper conduct, and want of skill of the then master, and of the boat hands and servants under him, the said boat, Warrior, was run down upon, and came in collision with the steam boat Erie, whereby the former was sunk, and the whole of the aforesaid cotton became and was wholly lost to the plaintiffs.

The trial was had on the general issue, joined between all the parties. Judgment was rendered for the plaintiffs below, against all the defendants, except Sims & Scott; from which the other defendants prosecute this appeal.

All the questions presented for revision arise out of a bill of exceptions, taken on the trial by the said defendants. From the exceptions, it appears that the deposition of J. B. Leavens had been taken and was offered in evidence; that the commission for taking the same, entitled the cause as one pending between Charles G. Pitcher & Co. as plaintiffs, and Wm. Jones, jr. and others, defendants, and that the certificate of the commissioners taking the testimony, in stating the title, named all the parties, plaintiffs and defendants, except, that the name of John Jones, one of the defendants, was omitted.—It is also stated, that it did not appear, that there was any other cause in the court, wherein the parties, whose names were expressed in the commission, were parties litigant: and it appeared, that the title of the cause in the commission, corresponded with that on the docket of the court. The deposition was taken by consent, in writing, designating the time and place, and signed by A. Ready, for Sims & Scott; Shortridge & Sims, for Donadlson & Hammond; Gayle & Vandyke, for

Wm. Jones, jr. that the names of Horner and John Jones, (for whom the latter counsel had appeared in pleadings as well as for Wm. Jones, jr.) were not expressed; nor was their consent, or waiver of notice, or the service thereof in any other way, shewn.— The admissibility of the evidence was objected to, on the grounds, that *John Jones* had no notice of the time and place of taking it; and that the certificate and commission did not sufficiently identify the cause. But the court overruled the objection, except as to John Jones, and permitted the testimony to be read against the other defendants.

The plaintiffs' counsel further offered in evidence to the jury, a sworn copy of the registry of the steam boat Warrior, made in the custom house, at Mobile, with a view of showing the defendants were owners of said boat; which enrolment is in the usual form, purporting to have been made on the affidavit of Wm. Jones, jr. of Mobile, in conformity to the act of Congress, in such case provided; and stating that he, together with others therein named, citizens of the United States, were the sole owners of the boat; that she was built in Ohio, &c.    To the reading of which the defendants objected; which objection was sustained as to all the defendants, *except said Wm. Jones*, on whose oath the enrolment appeared to have been made in the custom house; and against him it was read to the jury.

It was also proved, that the steam boat Warrior, was carrying freight on account of her owners; that there was a clerk on board, who kept the books, in which were charged accounts for freight.    There was no particular proof of a partnership, other than the reception of freight, upon the account of the own-

ers. "The court instructed the jury that they might find against such of the defendants as were joint owners, if they were liable, and in favor of such as were not liable." There were no instructions given, or requested to be given, to the jury, as to how many of the defendants were partners; other than what appears in the other parts of the record referred to.

The defendants, Sims & Scott, offered in evidence, and read to the jury, a contract under the hands and seals of said Edward Sims and David Scott, of the first part, and John W. Donaldson and Larkin Hammond, of the second part; by which each party bound themselves to the other, in the penal sum of $7,000; with a condition thereto, reciting that the parties of the second part, had purchased, from the parties of the first part, one half of the steam boat Warrior, (which was the amount of their interest therein,) for the sum of $3,500, to be paid in freight on said boat, at particular rates therein stipulated: also, that the parties of the second part should assure the boat, in some solvent insurance office, and the policy of insurance should be placed in the hands of the parties of the first part, as a further security for the payment of the purchase money. And the parties of the first part, acknowledged themselves bound, in the event of the payments being made, as aforesaid, then to make good and legal title to the party of the second part, to one half of the boat, as aforesaid, at the custom house, in Mobile, or as soon thereafter as demanded; which contract bears date the 9th September, 1828, (the bill of lading, in the usual form, for the lost cotton, bearing date the 20th January, 1829.) The court instructed the jury that the contract between Sims & Scott and Hammond &

Donaldson, was a transfer of the right of the former, in
the boat, to the latter : and was sufficient to discharge
the former from all liability for losses subsequently oc-
casioned by that boat: unless the contract was fraudu-
lent, or they had subsequently received a portion of the
earnings of the boat, or had participated in the appoint-
ment of a master, or had done some other acts of
ownership.    The agent of the plaintiffs, who ship-
ed the cotton on the Warrior, having proved that he
did not ship on the credit, and at the risque of the
defendants, Sims & Scott, but on the credit and risque
of the other defendants, the court directed the jury,
that notice to the plaintiffs, or their agent, that Sims
& Scott had transferred their right to Hammond &
Donaldson, before the shipment of their cotton, would
prevent the plaintiffs from charging them as joint
owners ; and that an actual notice of the transfer by
Sims & Scott to Hammond & Donaldson, need not
be given to the other joint owners, nor their consent
be obtained, in order to exempt Sims & Scott from
liability to the plaintiffs.

Evidence was also offered to show that the War-
rior and steam boat Erie, came in collision, and the
Warrior was thereby sunk.   It was further proved that
the Erie was ascending, and the Warrior descending
the river, and that by the understanding of masters
of boats, the descending boat must give the point, or
pass on the outside of the ascending boat ; but it was
customary for either the ascending or descending
boat to go on either side of the river, and hug the
points if deemed advisable, and it was considered they
had a right to do so : when the collision happened
there was darkness, which prevented the witnesses
from seeing more than twenty-five or fifty, or a hun-

CASES DETERMINED

dred, yards, which latter was about the width of the river at that point. There was also some evidence of the Erie having turned towards the nearest bank that the Warrior might pass outside of her, but on the former discovering that the latter did not bear out, she turned into the stream, believing a collision unavoidable, and that she might sustain as little injury, as possible, from the shock.

The court instructed the jury, that apart from contract, at common law, common carriers by land or water, were only excusable for losses which happened by the act of God, or the public enemies.— That the bill of lading before them contained an exception, which limited, to some extent, their common law liability; this exception was expressed by the words "dangers of the river only excepted:" that all the English and American decisions concur in the conclusion, that they signify the natural accidents incident to the river navigation, and not such as skill and foresight could avoid. In illustration of which, the court instructed the jury, that where two vessels meet, in such a situation that a collision cannot be avoided, by human prudence or skill, and a loss ensues, it is such a loss as the owners would not be answerable for. Further, that where two boats meet at a point in the river, where it is so narrow that they cannot pass, and can neither recede nor stop, but a collision is unavoidable, and a loss happens, it would be attributed to the dangers of the river, if the officers on the losing boat had taken the precaution to ascertain that the narrow was unobstructed before it was entered. Again, if by an understanding among the masters of boats, it is the custom for ascending and descending boats, to go on different

sides, and either should deviate from her accustomed track, and pass to the side assigned to the other, and while there, a loss occurs to her, by being struck by the other boat, the exception in the bill of lading will not excuse her owners from accountability for such loss.   Lastly, when a boat continues to pursue its course on a river, after it has become so dark that an object in advance of it, which might occasion a loss, can not be seen in time to be avoided, and a loss ensues, the exception in the bill of lading does not exempt the owners from liability to the injured party. · The court also instructed the jury that the question was not whether negligence, in the common acceptation of that term, was attributable to the master, and the officers of the. steam boat Warrior; but whether a loss had been sustained by the plaintiffs, in consequence of the sinking of that boat, which the employment of prudence and skill, on the part of the proper officers might have prevented.

The defendants' counsel requested the court to instruct the jury, that one partner, without the consent of the others, can not introduce a third person or partner into the concern; which the court refused, except as already stated.

There was no proof of a sale by Sims & Scott to Hammond and Donaldson, of their interest in the Warrior, before the date of the contract referred to ; nor was there any proof conducing to shew that Sims & Scott, were under any contract with the other joint owners, to retain an interest in the boat for any definite period.

To the foregoing opinions and decisions—to the instructions to the jury, as stated, and, also the re-

fusals to instruct, as requested, the defendants, against whom the verdict was had, excepted.

The assignments of error embrace various exceptions, which I arrange and number as follow:

1. The court permitted the testimony of Leavens to be read to the jury as evidence.

2. The court permitted the register of the boat to be read as evidence.

3. The court instructed the jury, they might find against such of the defendants as were joint-owners, and in favor of such as were not.

4. It was erroneous to decide, that the contract between Sims & Scott, and Hammond & Donaldson, discharged the former from liability.

5. The court charged the jury that common carriers were liable for all losses, unless occasioned by the acts of God or the public enemies: or, such as fall within the exception in the bill of lading, relating to the dangers of the river; and in his exposition of this exception.

6. The instructions were erroneous, in relation to the custom of ascending and descending boats in yielding the points.

Some other minor exceptions were noticed in argument; but I consider the above as including all that are worthy of examination, and necessary to this decision.

In reference to the objection to the title and description of the suit, as given in procuring the depositions of Leavens, I conceive it sufficient, in stating the case, to have given the title of the firm composed by the appellees—that, in the case of partners, this is all that is necessary or usual in practice.— This was done in the commission, by entitling them

Charles G. Pitcher & Co.; and the names of the persons composing the firm are also given in the certificate of the commissioners. Where several persons not being general partners, are co-plaintiffs or defendants, the suit can be identified with reasonable certainty, by entitling it in the name of one or more of them, with the additional words, "and others." In taking the evidence, the cause may be entitled in like manner : or, with equal propriety, the names of all may be given, as appears to have been intended in this instance. But, in setting out the names of all the defendants, the commissioners have omitted John Jones, one of them. Without deciding whether this furnished him a legal objection to the testimony, it is sufficient to say, it was excluded as against him ; and as all the others were properly named in the certificate, and which, with the commission, afforded reasonable certainty, as to the identity of the suit, and the title in the commission corresponded with that as stated on the docket, as there did not appear to have been any other suit upon the docket, which could be mistaken for this—or, in fact, any surprise—I cannot attach weight to this exception. As respects the want of consent, or notice of taking the testimony, it appears, that the consent of all the defendants was duly given, by their counsel, except, as to John Jones and Benjamin Horner; and, that they were represented, in the defence, by the counsel, who signed the consent for William Jones, jr. Waiving, however, the question, whether that circumstance could be considered tantamount to general service of notice on the same counsel, which would have been legal, it is sufficient to repeat, that the testimony was not admitted, against John Jones,

and this exception does not appear to have been taken, in favor of Horner. The fact may not have been brought to the notice of the court, or that ground of exception may have been expressly waived by him. The rule is, " that no point can be regarded as a proper subject of appeal, which has not been expressly litigated below :" *Mumford* vs. *Nicoll*—opinion of J. *Wordsworth.*[a]

*20 Johh. 625.*

If, therefore, it shall be found, in the further examination of the case, that part of the defendants could legally be convicted, and others discharged, from which it would follow, that evidence may have been admissible against some, which was not against others; on this point, there would appear to be no error.

2. That the register of the boat was admitted as evidence. The enrolment was made on the affidavit of Wm. Jones, jr. one of the defendants, and against him only, it was admitted as evidence ; a sworn copy; however, of the register, as found on the books of the custom house, without other proof that the affidavit on which it was entered, was made by Jones, is the evidence in question. Admitting that the register, with proof of the taking of the affidavit, would be evidence against the deponent, it is a different question whether, without such proof, it is evidence.

*b3Com 113*     Judge *Kent*[b] remarks, that, " the register is not of itself evidence of property, unless it be confirmed by some auxiliary circumstance, to shew that it was made by the authority, or assent, of the person named in it, and who is sought to be charged as owner." That, " without proof to connect the party with the register, as his direct or adopted act, the register has been held not to be even *prima facie* evidence, to

charge a person as owner. The case of *Sharp* vs. [a]14 John. *the United Insurance Company,*[a] was an action by R. 201. John Sharp, survivor of Robert Sharp, to recover back the premium of insurance on the ship *Hercules,* on a voyage from New York to Liverpool, on the allegation that he and his brother, Robert Sharp, were not owners, when the policy was effected. To prove this, the plaintiff offered in evidence the register of the ship, dated 2d June, 1809, by which it appeared, on the oath of *David Dunham,* that he, together with Robert Sharp were the owners. The policy bore date 24th October, 1810. *Spencer, J.* delivered the opinion of the court, and observed, that the only question was, whether the register was evidence, *prima facie,* that Robert and John Sharp were not the owners. That "the object of the register was, to show the character of the vessel, and to entitle her to the advantages secured by law, to vessels of our own country." That it would be incongruous to allow a person who applies for an insurance, representing himself to be the owner of the vessel, to set up the act of obtaining a register as evidence to the contrary; especially after the lapse of several months after it bears date. *Dunham* was a competent witness, and he ought to have been examined, or some proof should have been offered, to show how the ownership stood when the insurance was effected; that the oath of the owner in obtaining a register, is proof for no other purpose. The register would not be [a]4 Taunt. evidence *against Sharp,* unless it were shown that he 651—2ib. 5 —3ib 176— sanctioned or adopted it:" and that the principles he 3Cowp240 —8East.10 advanced, were fully supported by many English —4ib 130— 14ib.226— decisions.[a] This New York case was different from 17ib.169.

the one under consideration, in as much as in that, the register was offered in favor of the one charged as owner, to prove the contrary, and was inconsistent with the policy subsequently obtained. But the principle of the decision, would seem equally to exclude the register, as evidence of ownership, even against those purporting to be owners, until shown to have been sanctioned or adopted by them; and to sustain the position that the register alone, purporting to have been made on the affidavit of one, or more of them, would not prove the fact. Some evidence is necessary from a witness that can testify to the fact, of taking the oath, or otherwise sanctioning or adopting the enrolment. It is suggested in argument, that this particular exception was not taken and reserved on the trial. The bill of exceptions shows, that a sworn copy of the register was offered, with a view of proving that the defendants were owners of the boat; it does not appear that any foundation was laid for its admission; or that any other proof of its authority accompanied it: but it does appear to have been objected to; and that the objection was overruled as to Wm. Jones, one of the defendants, on whose oath it appeared to have been made in the custom house. From this, the rational inference is, that it purported to have been so made; and from an inspection of it, as exhibited, such is the fact. It may also be worthy of notice, that, in the opinion of the presiding judge, which accompanies the record, as a part of it, he says, "the register of the boat appears on its face, to have been made on the affidavit of the defendant, Wm. Jones, that he was a joint owner. It was consequently made with his privity, and must be received as an admission of ownership, by him."

The case of the *United States* vs. *Johns*,[a] is cit- ₄ Dallas,
ed on the part of the appellees, and affords some plaus- ⁴¹².
ibility to the argument in favor of its admissibility.
That was an indictment under an act of congress, de-
claring it a capital crime to cast away or destroy a
vessel, with intent to prejudice the underwriters.—
After proof of the order for insurance, and the sub-
scription to the policy, a copy of the *manifest* of the
cargo, certified under the hands and seals of the cus-
tom house officers, was offered in evidence, after
proof by a witness, that he had compared it with
the record. On objection made that there was no
evidence that the original manifest was subscribed
by the prisoner, or even delivered by him, the court
held, that, as it was made the duty of the collector to
record, in books to be kept for that purpose, all man-
ifests, and as it was a record, the proof was admissi-
ble. The report of the case is very defective and
unsatisfactory, if the question was duly considered ;
and, though the distiction, between the competency
of a manifest, and a register, is not apparent, per-
haps the court would have recognised some. The
object of the manifest, was to show the particular fact
then in contest—that of the register, was to show a
fact, distinct from the one, which it was offered to
prove, viz: the national character, and particular de-
scription of the vessel. But, if the principle be the
same, I should incline to question the authority of
*John's* case. It was a *nisi prius* decision, in the Fe-
eral circuit court, and the prisoner was acquitted—so
that it did not undergo the strictest scrutiny.

It is also said by *Starkie*, (vol. 1, p, 179,) that "the
register of a ship is evidence to *negative* ownership,
since no one can be an owner, who is not registered

as such; but the register is not necessarily proof of the ownership, without showing the privity of the party, since the entry may have been made by a, stranger, for the purpose of fraud." His first position appears to require qualification; as I think it will be seen, that a property can exist, independent of the enrollment: *Weston* vs. *Penniman.*[a] As to the latter position, it is difficult to conceive how the privity can be established, or the danger of fraud or mistake excluded, unless by proof of the making the affidavit, or some direct sanction or adoption of it.

In the case of *Wendover & Hinton* vs. *Hogeboom,*[b] it was held, that a regular bill of sale was not essential to transfer the property in a vessel, but the same passes by delivery, like any other chattel; and that the law of the United States, requiring the *register* to be inserted in the bill of sale, on every transfer of a vessel, affects only its character and privileges, as an American vessel.

I recognise no American statute, which entitles registers of vessels to more credence, in this country, than is allowed to similar documents in England.

The case of *Frazier* vs. *Hopkins & Long,*[c] was an action for repairs done to a ship. The plaintiffs sought to charge the defendants, as the registered owners. To prove them such, a clerk from the custom-house was called, and he produced the register book, in which was an entry of the transfer of the ship to the defendants: and who appeared to continue the owners. Sir *James Mansfield,* Chief Justice, remarked, in the decision, that the defendants might be the owners of the ship, but it was not proven; that the custom house books, by themselves,

[a] 1 Mason, 306, 3 Kent Com. 97.

[b] 7 John 308.

[c] 2 Camp. N. P. 170.

were not sufficient to charge them, unless they were made evidence, for that purpose, by act of parliament; that, there was no proof, to connect the defendants with the entries relied upon : and, for aught that appeared, they were ignorant of its existence, till it was produced in court—That, perhaps, the oath taken by them upon the transfer, might be sufficient; but the plaintiffs had established no connection between them and the property in the ship. He, therefore, directed a *non-suit.* After which the court of common pleas refused a rule, to show cause agaist setting it aside.

The same rule was applied in the case of *Smith* vs. *Fuge,*[a] which was brought for seaman's wages. The register was offered, in evidence, from which it appeared, the defendant was the sole owner of the ship; and that the register was granted, on his own oath. *Lord Ellenborough* decided, that, the defendant could not be charged, through the medium of the register, without direct proof, that he took the oath, or adopted the character of the owner.—That, though he had no doubt, but he did take it, and was the sole owner; yet, for any thing that appeared, a stranger may have taken the oath in his name. See, also, *Tinkler* vs. *Walpole.*[b]

Again, in the case of *Tud* vs. *Martin & others*[c] the defendants were charged, as owners of the ship, *Young Roscious. Lord Ellenborough,* there, also, held, that an entry in the register book, in the customhouse, stating, that a certificate of the register was granted, *on the oath of Martin,* that he was owner, was not admissible, as *secondary* evidence of ownership, against him; although it was shewn, that all the affidavits on which registers had been granted,

[a] 3 Camp. 456

[b] 14 East. 226.

[c] 4 Camp 89

had been burned, in the custom-house. He said, the plaintiffs might call the collector's clerk, or some person, who had seen the affidavit, and knew it was made by the party sought to be charged.

From this review of authority, it sufficiently appears, there was error in permitting the sworn copy of the register to go to the jury as evidence, even against William Jones, though it *purported* to have been granted, on his affidavit, without other proof of the fact.

3. It is objected, that the court instructed the jury, that it was competent for them to find against such of the defendants as were joint-owners of the boat, and in favor of such as were not.

It is necessary to investigate, with some minuteness, the nature of this injury and remedy, to test, fairly, the accuracy of this principle. The doctrine of the common law, is understood to be, that in an action upon the case, against joint-owners of a vessel, for a *misfeasance*, the action is, in its nature, joint and several: all the owners, or any number of them, may be joined, as defendants, and the plaintiff may recover, against all or part of those who are made defendants; and, in this respect actions *ex delicto*, are different from actions *ex contractu*. That, in actions of the latter description, all persons, jointly liable, must be joined as co-defendants. But, the practice has undergone a modification, as respects the consequences of a failure to join all. In the early cases, in England it was held, that, where the action was founded on contract, all the proprietors must be joined; and, that the *non-joinder* need not be pleaded in abatement, but was a good ground of *nonsuit*, at the trial.—*Boson* vs. *Sandford.*[a] But, it ap-

<sup>a</sup>2Shower, 478; 3Mod R. 321.

JONES et al. *vs.* PITCHER & CO.

pears, that this latter point has since been settled differently, in *Rice* vs. *Shute*,[a] and in *Abbott* vs. *Smith*,[b] and that the usual practice has subsequently been to require the *non joinder* to be pleaded *in abatement*, or the exception will be waived. This rule of practice is evidently most salutary; it avoids the danger of defeat in many actions for the same cause, and for the want of information, very often possessed by the defendants alone. By the reasonable requisition that, if they will except to the *non-joinder* of others, as defendants, they shall do so by plea in abatement thereby disclosing their knowledge of the persons jointly liable with them; the plaintiff need be exposed to but one defeat, and more summary justice can be done.

[a] 5 Bur 2611 King's B.
[b] 2 Black. 947, in the C. Pleas.

In the case of *Govett* vs. *Radnidge, et al.*[c] the action was *ex delicto* against carriers, for carelessly and negligently damaging the plaintiff's goods. On not guilty pleaded, one defendant was convicted, and the others were acquitted: a motion being made in arrest of judgment, *Lord Ellenborough* pronounced the opinion of the court, and distinguished that case from *Boson* vs. *Sandford*, which was in *assumpsit*; and said, it was not applicable to the one before him, which was an action on the *case*. He thought there was no objection to allowing the plaintiff to allege his *gravamen*, if he preferred it, as consisting in a breach of duty, arising out of an employment for hire; and to treating such breach as tortious negligence, instead of considering the same circumstances as forming a breach of contract, implied from the same consideration of hire. He held, that the plaintiff was entitled to judgment against the one defendant, against whom alone the verdict had been found.

[c] 3 East. 62.

The cases of *Powell* vs. *Layton;*[a] *Max* vs. *Roberts,* and *Butherion* vs. *Wood*[c]—all sanction the same principle, that in ordinary cases of liability incurred by common carriers, the plaintiffs may elect for their remedy, actions, either in form *ex contractu*, or *ex delicto*—that, if the former, it must be in *assumpsit*—if the latter, *case;* and, that the form adopted, must be prosecuted and defended, according to its distinct nature. In the latter case referred to, the court remarked, that it was an action upon the *case*, against a common carrier, upon a duty imposed by the custom of the realm : or, in other words, by the common law.—That a breach of that duty was a breach of the law ; and, for which an action would lie, founded on the common law; which action wanted not the aid of a contract to support it.—That the action of assumpsit would also lie, but it was of recent date, compared with the other : and that actions upon the case, were several, as well as joint.

The case of the *Orange Bank* vs. *Brown et al.*[d] was an action upon the *case*, against six defendants' as proprietors of a steam boat, in which they were charged, as common carriers, for the loss of property: the *gravamen* was alleged to have arisen from a breach of duty. On a plea in abatement, that there were other proprietors, (naming them,) who were jointly liable ; and to which the plaintiff demurred, the plea was overruled, and a *respondeas ouster* awarded. In the revision of the case, in the Supreme court, Chief Justice, *Savage* delivered a luminous opinion, (as that of the court,) taking a comprehensive view of the whole doctrine. He adverted to the cases above referred to, and several others, and said, each form of action, against common car-

[a]5 Bos. & Pul. 565.
[b]12 East.89
[c]6 Bord. & Bing. 54.

[d]3 Wend. 158.

riers, has its advantages and disadvantages. That, if *assumpsit* be brought, it may be abated for *non-joinder* of proper parties ; but it survives against the personal representatives; and the common counts may be joined in the declaration. If the action be, in form, *ex delicto*, and founded on the custom, the suit does not abate for the *non-joinder* of all the proper parties; and, in a proper case, a count in *trover* may be joined.

It was there held to be the true rule, as deduced from all the cases, that an action solely on the custom, is an action of *tort.*—That, in such action, all, or any number of the owners of a vessel, coach, &c. used by common carriers, may be sued, and judgment may be rendered on a verdict against all or any part, only, of those against whom the action is brought : the plaintiff has his choice of remedies, either to bring *assumpsit* or *case;* that when one or the other action is adopted, it must be governed by its own rules. But if the plaintiff states the custom, and also relies on an undertaking, general or special—as in *Boson* vs. *Sandford*, and some others— then the action may be said to be *ex delicto, quasi, ex contractu ;* but, in reality, is founded on the contract, and, to be treated as such.

The Chief Justice, in that case, also, corrected his error, in the previous case, of *Allen* vs. *Sewall,*[a] where [a 2 Wend. 338.] he had said, that in an action *ex contractu*, in which there was a *non-joinder* of proper defendants, advantage could be claimed of it, otherwise than by plea. He said, he was satisfied, his former opinion was incorrect.

Mr. *Jeremy*, in his "Law of Carriers," (page 117,) says, "the present usage sanctions the principles and

adopts the advantages of both forms of actions, by permitting the case to be considered either way, as arising *ex contractu,* or *ex delicto,* according as the neglect of duty, or breach of " more express contract is meant to be relied upon, as the cause of injury ;" and that, " by this means, a multiplicity of actions, and the expense of useless pleas, are avoided ; and the plaintiff, as his convenience requires, frames his principle count, so as to join a count in trover therewith, in the one case, or the money counts in the other—according as he may have separate causes of action, to which such counts are respectively applicable."

Again, he says, (page 124,) "where several carriers are co-defendants, and judgment is executed against one of them, only, there seems to be no doubt but that the action would be so far considered to be founded on contract, as to make the others liable to contribution ; notwithstanding the form of the action may have been in tort. But, where the injury arises from the gross negligence or malfeasance of such individual, he cannot compel the others to contribute."

[a 1 Wils 281] But, as early as 1750, in the case of *Dale* vs. *Hall,*[a] the court of King's Bench sustained an action of assumpsit against a common carrier, by water, on his general undertaking, according to the custom. It was there held, that the law raises the promise, to carry safely, which shows, that the action may be *ex contractu ;* and, that no special promise need be proven : also, that a defendant, in such a case, is answerable, in all events, except, for losses, sustained by the act of God, or the king's enemies.[b]

[b Sel. N. P. tit. carrier —4 East. 371 —5 Id, 428, 512—6 Id. 564—and 3 Id. 62.]

The result of all these authorities, I conceive

clearly to be, that, in an action against carriers, in form *ex delicto*, all, or any part of the joint-owners of the vessel or other vehicle of transportation, may be joined as defendants; and that, on trial, all, or any part of the defendants may be convicted, and judgment given accordingly. This action, however, is in assumpsit, the nature of which is different: and that, in this form, the practice, under the common law, in England, and in New York and other States of the Union, requires, that all the joint-owners thall be joined as defendants; and, that all must be convicted, or none. Yet, if there be a non-joinder of defendants, even in assumpsit, according to the recent; and, I think most correct practice, it can only be taken advantage of by plea in abatement. Then, unless there be some statute to vary the case, in this State, the rule would appear fatal to this verdict, and contrary to the instruction sof the Judge below—that, part, only of the defendants could be convicted, if all were not found joint-owners of the boat.

The appellees, however, have referred to the statute of 1818,[a] "for the better regulation of judicial proceedings." The 8th section of which provides, "that whenever any cause of action may exist against two or more partners, trading in partnership, or against partners of any denomination whatever, it shall be lawful to prosecute an action against any one or more of them." And the 12th section is, "That where any suit shall be instituted against two or more persons, as partners, in any firm, if one or more persons, not partners in said firm, shall have been sued as such, the court before whom such suit is, or shall be pending, shall discontinue said suit against such person or persons as shall appear not

[a] Toul Dig. 449

to be partners in said firm, and proceed to judgment and execution against all or any of the defendants in such action, who shall appear to be partners."

If the joint owners of this boat, should have been regarded as partners, as far as this suit is concerned, within the contemplation of the statute, the verdict was a legal and sufficient shewing to the court that some of the persons sued as such, were not partners: the defendants were sued as joint owners and partners in the business of freighting on the boat, and it was attempted to be proven that two of the defendants were not joint owners, consequently, not partners; in this aspect of the case, the statute would sustain the instructions, that it was competent to find against the joint owners only, and in favor of such defendants as should appear not to be proprietors.— There appears to have been no special instructions given, or requested, as to which of the defendants were partners, or what circumstances of contract, or connection of interest in the employment of the boat, would render the joint owners responsible in this action as partners. But as above stated, the defendants were declared against as joint owners and partners in freighting on the boat, and the jury have found against part of them, accordingly.

Then the question recurs whether, from what appears of record, the joint owners of the boat should have been held responsible in the character of partners, within the meaning of the statute, for such legal demand as the plaintiffs could sustain against them on account of the boat.

*Kent*, J. (in his Commentaries, vol. 3, p. 117,) observes, that "the cases recognise the clear and settled distinction, between part owners and partners—

that part ownership is but a tenancy in common, and a person, who has only a part interest in a ship, is generally a part owner, and not a partner.   As part owner, he has only. a disposing power over his own interest in the ship, and he can convey no greater title.   But, there may be a partnership, as well as a tenancy in a vessel;" and, " whether a person is to be considered as a part owner, or as a partner, in a. ship, depends upon circumstances.   The former is the general relation between ship owners, and the latter, the   exception, and requires to be specially shewn."   But, further, he says, " They are analogous to partners, and, liable, as such, for necessary repairs and stores, ordered by one of themselves ; and, this is the principle and limit of the liability of part owners."   Also, that " the English and Scotch law, render part owners, in all cases responsible *in solido* as partners, for repairs and necessary expenses, relating to the ship, and incurred on the authority of the master or ship's husband."   He refers to several cases, which sustain his positions so far as they go.

In the case of *Seaton* vs. *Stanley et al*,[a] one John [a] Dal.129 M. Taylor, having put a vessel on the stocks, contracted with tradesmen, and had the work a little advanced, then sold one half to Stanley, and one fourth to J. Carson ; but continued to be the ship's husband : as such he fitted her out, received the bills of disbursements, and was paid, by the others, their proportions of the building, (including the demand of the plaintiff,) and out-fit.   While the ship was on her first voyage, Taylor failed—the bill for the painting not having been paid, and the other two refused to pay it.   The action was brought, to recover this demand, against all three.   It appeared, that

Stanley and Carson became interested, after the contract for the painting was made; but, that the most of the work was done, after they had so become interested; and after they had engaged a captain for the ship—and the account was charged to the ship.—The court of common pleas (of Pennsylvania) ruled, that, as the work was performed after they had become owners, and appeared avowedly so, it was done on their credit.

Admitting the general principle, that part owners are not, in their general relation, partners, in respect to the property in the vessel, does it follow, that they are not to be regarded as partners, in respect to their liability to others, for goods lost or damaged, or other responsibilities incurred by the vessel? They have an entire community of interest, as respects the profit and loss, in the employment of the vessel, in proportion to their respective interests—as in case of a mercantile firm. Their contracts, for freight, for stores, for assistants, repairs, &c. are numerous and complicated, in like manner.

It is not now made a question whether a joint owner or partner could thus be charged beyond his proportion of the value of the vessel; but whether they are generally chargeable, as partners, to customers and strangers for legal demands incurred by the vessel, during such joint ownership. It appears to be conceded, by all the authorities, that the owners are liable, as partners, for all legal claims for repairs and stores, contracted by themselves or agents; on what principle then can there be a difference as respects demands arising from their *breach of contract* in other respects.

Most of the litigation on this subject has related to

the question whether or not the joint owners were partners, in respect to the property in the vessel — That is a matter which, generally, concerns only themselves, and to be finally adjusted by them; so that it is perfectly consistent that they should hold the vessel as tenants in common, denying to each other the power of absolute control, or the disposal of the vessel, and yet be partners in the profit and loss from the employment of the vessel, in the same manner, that several persons might hold a house and lot, as tenants in common, while they carried on a mercantile concern, as partners, in the house. A consequence of this general relation of tenancy in common, in a vessel, must be, that each joint owner can transfer his interest therein, without giving notice to, or obtaining the consent of, the others, and that this is an implied condition, in any incidental partnership, that may arise from the connection.

The subject has been extensively investigated, in several cases in New York; perhaps the most satisfactorily in the case of *Nichol* vs. *Mumford*,[a] in the court of Chancery; and again on appeal.[b] The facts of the case are unnecessary to be noticed, except that the vessel was owned in equal shares between one Stilwell & Mumford, and was fitted out on a circuitous trading voyage, at the joint expense of the parties. In both courts the principle was recognized, that the general relation of joint owners of ships, is that of tenants in common of the vessel; but that joint owners of the freight and cargo, are joint tenants or partners. The decree of the Chancellor was reversed in the court of errors, on the ground that he had confined the doctrine of partnership, as respects owners of vessels, within too narrow limits. Yet his

[a] 4John.Ch R. 522.
[b] 20John.R. 611.

language was, that "Stilwell and the defendant, being equally concerned in the vessel and her cargo, and in the profit and loss of the voyage, there could be no doubt that the account was to be taken as between partners, in respect to the freight and cargo; and the only difficulty was, as to the vessel. That, as far as the defendant and Stilwell were to be considered partners, so far the defendant was to be allowed a lien on the partnership property, in respect to the balance due him on the partnership account," &c.

The court of errors in reversing the decree, declared the joint interest to be "a limited and special partnership, not only as to the *cargo, freight and profits,* thereon, but as to the fitting out of the *vessel.*"— See, also, *Doddington* vs. *Hattel,*[a] *Smith* vs. *De Silva and others.*[b]

[a] 1 Vez. sr. 497.
[b] Cow. 469; Ex parte Parry, 5 Vezjr.575.

These cases, I think, sufficiently establish the principle, that joint owners of steam boats, or other vessels, for the time being, may be viewed and treated as partners in respect to all liabilities incurred by the vessel, and are amenable to process as such, at the suit of any one having a legal demand against them; they fall within the reason and influence of our statute referred to, and were sued as *partners*— consequently there was no error in the instructions that part, only, of the defendants might be convicted.

4. What was the legal effect of the contract between Sims & Scott, and Hammond & Donaldson?

Can the agreement that the vendors should execute title at a future day, and after payment of the purchase money—that they should hold the policy of insurance, as collateral security, and that the consideration should be paid in freight, have the effect to

continue their responsibility as part owners. Every thing else, toward the final consummation of the sale, had been accomplished. The interest had actually passed into the possession and use of the vendees; and they were exercising the right of ownership, and sharing the profits—one of them being master; and the shipment was proven not to have been made on the credit of the vendors. If they were still liable would, it seem, the vendees must also have been, so that there was a double responsibility, for the same interest.

The case of *Wendover & Hinton* vs. *Hogeboom and others*, before referred to, was to recover the price of sails, furnished to A. Vosburgh, the master of a vessel. It appeared, from the register, that from 1804, to 1807, the defendants were the owners. But, in 1805, an agreement was entered into, between the defendants and Vosburgh, by which the latter purchased, and received possession of the vessel, for his sole and exclusive benefit, and was to pay by instalments; and, when this was done, a regular bill of sale was to be executed. The sails were afterwards purchased on a credit; and, after expiration of the term, Vosburgh, representing himself to be the owner, obtained an extension of the term of credit. The purchase money for the vessel, was paid, according to the contract; but the bill of sale was not executed, until 1807—when Vosburgh, having sold the vessel to another, obtained the bill of sale, to himself, and conveyed to the other. The Supreme court held, that the defendants, the vendors, were not liable; and, this, on the ground, that they had ceased to be owners, when

HARVARD LAW SCHOOL LIBRARY

JONES et. al. *vs.* PITCHER & CO.

the sails were purchased, notwithstanding the regis-ter still remained in their names, and the title had not been executed; and, that the credit was given to the master.

In the case of *Leonard* vs. *Huntington*,[a] a similar sale had been made of a brig—the payment to be made by instalments, and the bill of sale to be after-wards executed. The possession and exclusive con-trol immediately passed to the vendee. In the mean while the register stood in the name of the original owners. It was ruled, that they were not liable for repairs, made by the direction of the master, as agent for, and on account of the purchaser, between the time of executing the contract, and the final consum-mation of it, by the delivery of the bill of sale; but, that the person furnishing the repairs, must look to the purchaser for payment.—That, "the register standing in the name of the defendant, did not, in any manner, determine the ownership of the brig."

The case of *Thorn* vs. *Hicks*,[b] is, perhaps a more perfect parallel to this; or, if there be any difference, it is in favor of the vendors in this. There, all the profits of the vessel were to be applied to the pay-ment, until discharged. In that case, the owners of a sloop contracted with Jacob Acker, that he should take the sloop, and use it, in the freighting business—out of the proceeds, to pay the owners, their respec-tive portions of the price, as fast as he could earn the money, with it: until paid, the legal title was to remain in the vendors, and then to be transferred to Acker. He immediately took possession, and run the sloop, until the loss of the articles which had been shipped on it—to recover for which, the action was brought against the vendors. The circumstances of

*Margin notes:* [a] 15 John. 298    [b] 7 Cowen, 697

the contract and that Acker carried on the business on his own account, were known to the plaintiff when he made the shipment.

The decision of the court was, that, the mere circumstance of the naked title to the vessel, remaining in the defendants, to secure the purchase money, for which she had been sold, unquestionably would not render them liable, as owners, on the contracts of the master, (who was, also, vendee,) or for the consequences of his negligence, or unskilfulness.—See, also, *Reynolds* vs. *Tappan.*[a] Thus, it sufficiently appears, there was no error on this point.

[a] 15 Mass R 370

5. To what extent, were the owners liable, as common carriers: and what is the meaning and effect of the exception in the bill of lading of "the dangers of the river?"

This point involves one of the most important principles known to the law; not only as respects its influence on this case, but on the commercial interests and pursuits of the whole community. Few States afford greater facilities to water transportation than this, with its numerous navigable streams, intersecting almost every county; a consequence of which is, that a large portion of our citizens, instead of providing means of their own, have adopted the apparently compulsory practice of entrusting to public carriers, an unusual proportion of their annual products and consumptions. This is the first case that has fully presented the question for the consideration of this court. It has been elaborately discussed by counsel, and has demanded, and, I trust, received the due attention of the court.

It is objected, however, among other grounds taken in argument, that the declaration has not been

so framed, as to charge the defendants, as common carriers. It will be seen, as already stated, that the declaration alleges, in substance, and almost in the same words, that the defendants below, before and, at the time of this shipment, were the owners and proprietors of the boat, and co-partners in freighting on the same ; and which boat had been usually employed by them, in carrying and transporting cotton, and other articles of merchandise, to and from the port of Tuskaloosa, to the port of Mobile, and other places in this State, for hire," &c. This, or any other tantamount averment, I consider a sufficient allegation of their character as common carriers; nor can I leave entirely out of view, the known character and object of steam boats on our rivers.— The usage and custom of the country, strongly associate with the name and nature of the vehicle, the employment of transporting cotton, and the variety of other articles, constituting merchandise, generally, for compensation, or hire.

According to the common law, and apart from the exception, usual in the bills of lading, it has been often ruled, that, by the delivery of goods to be conveyed, for hire; to any one who exercises such public employment, "the law charges the person so entrusted as responsible, at all events, for every injury in any other way, but from the acts of God, or of the king's enemies."—*Coggs* vs. *Bernard*[a]—*Dale* vs. *Hall*.[b] And, however severe, it appears to have been so established by the policy of the law, for the security of all persons, the necessity of whose affairs, obliges them to trust persons in that employ, in the course of their dealings. In support of the same rule of policy, every thing has been consider-

[a] Ld. Ray. 919.
[b] 1 Wil. 281; Law of Car. 31.

ed negligence in the carrier, from the moment he re-
ceives the goods, which the law does not excuse;
and, to prevent collusion and vexation, and the ne-
cessity of going into circumstances, impossible to
be unravelled, the law always presumes against the
carrier, unless he show the injury to have been done
by the public enemies, or by such act as could not
happen by the intervention of man—as storms, light-
ning, tempest, &c.     Another ground for this legal
rigor, is the reward, which usually bears a due pro-
portion to the expense and risque.

*Kent, J.*[a] observes, it was decided in the reign of [a2Com.465]
Charles II. by the court of King's Bench, upon great
consideration, " that the master of a vessel employed
to carry goods beyond sea, in consideration of the
freight, was answerable as a common carrier.    That
the same doctrine has been recognised ever since,
and it applies equally to the carrier of goods in the
coasting trade, from port to port, and to a bargeman
and hoyman, upon a navigable river, and to wharf-
ingers—they are all liable in their respective charac-
ters as common carriers, and to the whole extent
of inland carriers; except so far as they may be ex-
empted by the exceptions in the contracts of the char-
ter party, and the bill of lading, or by statute."—
Again, he says, [b]" The books abound with strong [bId.466 '67]
cases of recovery against common carriers, without
any fault on their part; and we cannot but admire
the steady and firm support which the English
courts of justice have, uniformly and inflexibly, given
to the salutary rules of law on this subject, without
bending to popular sympathies, or yielding to the
hardship of a particular case."    That "according to
the modern English doctrine, which may be appli-

cable with us, carriers may limit their responsibility by special notice of the extent of what they mean to assume. The goods in that case are understood to be delivered on the footing of a special contract, and it is necessary, in order to give effect to the notice, that it be previously brought home, to the actual knowledge of the bailor; and be clear, explicit and consistent."[a]   In New York, "the English law on the subject has been fully, explicitly, and repeatedly recognized in its fullest extent; and equally in respect to carriers by land and water, and equally in respect to foreign and inland navigation:" _Colt_ vs. _McMichen_,[b] _Scrieffelen_ vs. _Harvey_,[c] _Elliott_ vs. _Rosseu_,[d] _Kemp_ vs. _Caughtry_.[e]

It is found, however, that in a later case than those referred to, the Supreme court of that State, made a decision on a different principle.   It was the case of _Aymar_ vs. _Astor_,[f] relating to transportation from New Orleans to New York.   It was held that the master of a vessel was not responsible like a common carrier, for all losses, except occasioned by the the act of God, or the enemies of the country.   That he was responsible only for _ordinary_ neglect, and it was a proper question of fact for a jury, whether the master had used ordinary care and diligence in carrying the goods.   But this decision is believed not to be sound law— that it is in direct repugnance to the various previous decisions of the same court.   It is so considered by _Kent_,[g] and by _Story_.[h]   It is also inconsistent with a still later decision in the same court.

The case alluded to is _Allen_ vs. _Sewell_,[i] it was against the owners of a steam boat, as common carriers, to recover for a packet of bank notes put on board

_Margin notes:_

[a] Ib. 470.

[b] 6 John.R. 150.
[c] Id. 170.
[d] 10 Id. 1.
[e] 11 Id.107.

[f] 6 Cow.266

[g] 2 Com.473
[h] Story on B. 323.

[i] 2 Wend. 327.

the boat at New York to be transported to Albany, which was not delivered at the latter place. The proprietors constituted a corporation by statute: one section of which provided, that the members of said corporation should be liable as individuals, in the same manner as carriers at common law for the transportation of goods, wares, &c. *Chief Justice Savage*, who had delivered the opinion of the court in the previous case, also delivered it in this. He considered the question of responsibility uninfluenced by the act of incorporation. His language is, "I apprehend it was the intention of the Legislature, to put the defendants upon the same footing as to liability as if they had not been incorporated. Individual liability in the act must be understood in contradistinction to corporate liability, and the defendants must therefore be considered responsible to the same extent and in the same manner as if there was no act of incorporation." In conclusion, he says, "the liability of the defendants, is, by statute, the same as that of common carriers; and common carriers are responsible for the safe delivery of all goods intrusted to them or their agents, or servants, unless the loss is occasioned by the act of God, or of the public enemy. There needs no particular agreement for hire to render a common carrier liable; when there is none, the carrier may have a *quantum meruit* for it." The defendants were held responsible for the packet accordingly.

*Judge Story*, in his Commentaries on Bailment, appears to concur substantially with *Ch. J. Kent* on every point material to the decision in this case.— He also says, (page 323,) "the rule in reference to carriers by water, established in England, seems to

be generally understood to be the rule in America.—
It has been recognized in an ample manner in sev-
eral of the States." Among the various persons fal-
ling within the description of common carriers, he
mentions, (same page,) owners and masters of ships
and steamboats, engaged in transporting of goods,
for persons generally, for hire;" also, "lightermen,
hoymen, barge owners, ferrymen, canal boatmen,
and others employed in like manner."

In Pennsylvania, a disposition has been evinced to
mitigate the rigor of the rule of the English juris-
prudence, in respect to carriers by water; yet, the
Supreme court of that State, (as well as of others,)
has proceeded with great caution and regard to the
original principles of the common law: and there, the
practice seems not to have been definitely settled.—
But, even in that State, it is maintained, that car-
riers, on *inland waters*, are clearly liable for every
accident which skill, care and diligence, could have
prevented.—*Gorden vs. Little.*[a]

In Louisiana, where, not the common, but the ci-
vil law, prevails, it is said, the rule is less rigorous ;
and, that the owners of steam boats, have been held,
not liable, for a loss occasioned by fire, where pro-
per diligence had been used.[b] But, our jurispru-
dence contains a general adoption of the common,
in preference to the civil law.

The next inquiry relates to the meaning and ef-
fect of the saving, in the bill of lading, by the words,
"the dangers of the river, only, excepted." The
perils of the sea, and of the river, are so nearly al-
lied, that they may be considered the same, except,
in the few instances, in which the reason differs—
nor is the distinction always clear, between the dan-

[a] 8 Serg. &
Rawl. 533;
Story on
Bailment,
323; Kent's
Com. 473.

[b] Kent's C.
474; Story
on B. 324.

gers of either, and those arising from the "acts of God, or the public enemies." The causes to excuse the liability of ship owners and masters, besides those of the acts of God, or the public enemies, must be such as are expressly provided for, by the contract."

"Perils of the sea denote natural accidents, peculiar to that element, which do not happen by the intervention of man; nor are to be prevented by human prudence." But an exception to this definition is admitted, in the case of a vessel captured and plundered by pirates.—That has been adjudged a peril of the sea, and the only exception. A loss by fire, proceeding from any other cause than lightning, is considered, chargeable on the ship owner.[a]— See *Forward* vs. *Pittard.*[b]

> [a] 3 Kent's Com 171–2
> [b] 1 Term.R. 27.

Cases may occur, in which it is difficult to determine, whether the loss is properly attributable to the perils of the sea, or unavoidable accident, or the negligence or want of skill in the master. If, for instance, an obstruction be generally known, and the vessel be not forced upon it, by adverse winds, or tempest, the loss is imputed to the fault of the master. But, if it be forced upon a rock or shallow, by winds or tempest—or, if the bar was caused by a recent or sudden collection of sand, or other thing, of which there is no visible indication—in a place where vessels of the same size could previously sail with safety—the loss is to be attributed to a peril of the sea; which is understood to be the same as the *vis major*, or *casus fortuitous* of the civil law. Yet, it is conceded, that, what is an excusable peril, depends much upon usage, and the sense and practice of merchants; and, is a question to be

settled by the circumstances peculiar to the case.[a]— The English statutes have mitigated the common law, in a few cases of extreme hardship; but, there is no statute to influence our decisions in this respect.

It is clear, that this rigid responsibility, does not apply to persons or vehicles, which are not *usually* employed in transporting articles for persons *generally*, for hire; nor can any one be charged as a common carrier, for undertakings to carry, which were not made by him, nor under his express or implied authority.    This I consider the only effect of the two cases cited, in argument, on the part of the appellants.—*King & Mead* vs. *Lenox*[b]— *Satterlee* vs. *Groat.*[c]

It is also contended, that owners of steam boats are not to be viewed as common carriers, because they are not subject to action for refusing to carry on any particular application.    To this, it is conceived a sufficient answer, that the question is *res integra*, in our courts; and how it will be settled, when properly presented, does not appear.    If, however, it be admitted, that they would not be held to all the strictness of the common law, in this respect, from the presumption, that interest will prompt them to carry as much, and for as many as they safely can; or, for any other reason; it would not follow, that, from receiving one indulgence, they should be entitled to others, more essential, after voluntarily placing themselves in the general attitude of common carriers.

Judge *Story*, (Com. on B. 330,) recognises the same exceptions, and same definitions thereof, in respect to the liabilities of common carriers, as are

[a] 3 Kent's Com. 172.

[b] 19 John. Rep. 235.

[c] 1 Wend. 272.

JONES et al. *vs.* PITCHER & CO.

maintained by the other learned commentator refer-
red to; that the expression, "act of God," denotes
natural accidents, such as lightning, earthquakes,
and tempests; and, not accidents, arising from the
negligence of man—but, such as are from inevitable
necessity—which human prudence could not fore-
see or prevent. And, that the import of the words,
"perils of the sea," though, perhaps not exactly set-
tled, and strictly denoting, "the natural accidents
peculiar to that element," has, in some instances,
been held, to extend to events not attributable to na-
tural causes; as, in case of capture, by pirates, on
the high seas, and a collision by two ships, where
no blame is imputable to either, or, at all events, not
to the injured ship.

In illustration of the doctrine, cases given of the
loss or damage of goods, from being mutilated by
rats, on board the vessel, and from their gnawing
holes through the vessel, so as to let in the water.
In such cases, it has been adjudged, that, if the mas-
ter used all reasonable precaution against such dan-
ger, as, by having a cat on board, then the loss is to
be attributable to the peril of the sea, or inevitable
accident. But, the nice distinction has been main-
tained, both in England and America, that in case
of the destruction of a ship's bottom by worms, in
the course of a voyage; the cause did not excuse, on
the ground, probably, that the loss was by ordinary
wear and decay. The rule is further understood
to be, that the immediate, and not remote cause, is
to be considered.

It is not sufficient that the *immediate* cause which
could have been avoided by necessary skill and pru-
dence, was connected with a *natural,* or an *inevitable*

*remote cause*; the maxim "*causa proxima non remota*

a Story on
B. 331, '2;
Abbott on
Sh. 3.
*spectatur*," is in some cases applicable to carriers.[a]

Hence it results, that, in the instructions given by the Circuit Judge, that if the loss was sustained, "in consequence of the sinking of the boat, and which the employment of prudence and skill on the part of its proper officers could have prevented," that the owners are liable; and in his illustrations of the rule, as stated in the history of the case, there was no error; on the contrary, it was a sound exposition of the most current doctrine.

6. The only remaining assignment—that there was error in the instructions relating to the custom of ascending and descending boats, in yielding the points, is thought to require but a brief notice.

The history of the case clearly shows that evidence was introduced for the purpose of proving such a custom. And though that evidence was vague and indefinite, and may have been altogether unsatisfactory, yet as it was before the jury, they had a right to consider it, and it was competent for the Judge to charge hypothetically upon it. This only, the Judge appears to have done, by saying to the jury, in effect, that if there be such a custom among masters of such boats, they are bound to observe it, or if they fail, it will be at the peril of the owners. Such a custom would appear to be reasonable and salutary, and to bear a strong analogy to a rule sanctioned by the common law in relation to ships at sea. It is said, that, "in all cases of collision, the essential question is, whether proper measures of precaution are taken by the vessel, which has unfortunately run down the other. This is partly a question of nautical usage, and partly a question of nautical skill. If all the

usual and customary precautions are taken, then it is treated as an accident, and the vessel is exonerated. If otherwise, then the offending vessel and its owners are deemed responsible. Some rules however, which probably had their origin in the customs of navigation, are now adopted as positive rules of law. Thus, the law imposes upon the vessel having the wind free, the obligation of taking proper measures to get out of the way of a vessel that is *close-hauled*, and of showing that it has done so; otherwise the owners will be responsible for any loss which ensues. Therefore, a vessel sailing *with* the wind, must give way to one sailing *by* the wind; and the vessel sailing *by* the wind, is not obliged to alter her course."[a]

[a]Angell'sL J. for 1829 p. 20.

I conceive there is much more propriety in, and authority for, the encouragement of such a custom, than the suppression of it; and that, so far as the current of a river may be assimilated to wind on the ocean, the principle is analagous ; consequently, that in the hypothetical terms of the charge, there was no error.

My conclusion is, that there is no error in the record, except on the second assignment, which relates to the admission of the register as evidence, without other proof of its authority ; but on that point the judgment must be reversed and the cause remanded.

Such is the opinion of the court.

LIPSCOMB, C. J.—I have too much respect for the opinion just delivered, to dissent. But I cannot yield to it my entire and unqualified assent. I do not know that a case has ever before been decided, where

joint owners of a vessel have been held responsible as partners for any other purpose than for repairs, to, and provisioning for, the vessel; and that they have been held partners for these purposes, I believe, results from a principle of the admiralty law, that the credit is to the vessel and the liability *in solido.* But if it be law that they can be sued as partners, for losses sustained, still my objections. would not be answered in this case. I hold, that it is of the very essence of every co-partnership, that it should be formed and kept alive by the concurring assent of the partners; that the withdrawal of one member would dissolve the firm, unless that it was by the consent of the others ; and that there can be no change of partners, without the same concurring will of the others. If then, the owners of the steam boat Warrior, were co-partners, Hammond & Donaldson could not have been brought into the firm in the way they have been, nor could Sims & Scott, have been discharged from their liability. It does seem to me, that to sustain the charge of the court below, we must impose on a part of these defendants, the anomaly of appearing in, and filling different characters, as the case progressed. At one time to anwer the objection to Sims & Scott withdrawing, and introducing Hammond & Donaldson, we say that you are not co-partners, but joint owners, or tenants in common, and that a joint owner or tenant in common, can convey his interest. And again, when the objection to the severance, in the verdict in this action of assumpsit, is let out, Sims & Scott, is to be gotten over: we say, you have been sued as co-partners ; and the statute of 1818 will save the verdict. That, it authorises a verdict against as many as may be

JONES et al. *vs.* PITCHER & CO.

found to be members of the firm: and, that the discharge, by the verdict of the jurors, of others, who had been sued with them, as such, is no objection to the verdict. The character of the act of 1818 should deny it. In my opinion, a liberal construction, would not apply it to those who were only co-partners, by implication. The inclination of my mind, is, that they are not partners, but joint-owners; and, that the fact, that Sims & Scott were sued as such, when they had transferred their interest before the loss accrued, is fatal to this action.

But it is possible, these seeming incongruities might disappear, if I had an opportunity to study the case, and examine authorities: I have, therefore, only thrown out these suggestions, as the grounds of my doubts and difficulties. As to the extent of the liability of the owners, as common carriers, I fully concur—I have encountered no difficulty, only as to the remedy. As this case was argued at the last term, and held under advisement, I have not felt myself at liberty to ask my brethren, to hold it up for a longer period—although a continued indisposition has prevented me from deriving any advantage from the delay that has intervened.